[S.F. No. 24414. Nov. 21, 1983.]

TRIPLE E PRODUCE CORPORATION, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

**COUNSEL**

Littler, Mendelson, Fastiff & Tichy, George J. Tichy II, James J. Meyers, Floyd J. Palmer and Lindbergh Porter, Jr., for Petitioner.

Manuel M. Medeiros, Ellen Lake, Daniel G. Stone and Nancy C. Smith for Respondent.

Dianna Lyons, Daniel A. Garcia, Francis E. Fernandez, Carmen S. Flores, Marco E. Lopez, Carlos M. Alcalá, Federico G. Chavez, Ellen J. Eggers, Ira Gottlieb and Wendy Jones for Real Party in Interest.

OPINION

**RICHARDSON, J.**—We review a decision of respondent, the state Agricultural Labor Relations Board (ALRB or board), certifying real party in interest, the United Farm Workers of America, AFL-CIO (UFW or union), as the exclusive bargaining representative of the employees of petitioner Triple E Produce Corporation (employer). The primary questions raised are (1) whether the ALRB applied the proper standards in reviewing alleged threats made by union organizers during a representation election, and (2) whether the board's decision is supported by substantial evidence. We will conclude that the appropriate test is an objective one, and that the board's conclusion that the statements in question were mere propaganda is unsupported by the evidence. Because of the threatening nature of the statements and the circumstances surrounding their utterance, the election and ensuing certification must be invalidated.

This very extended litigation began in 1975. On October 17 of that year, the UFW filed with the ALRB a petition pursuant to Labor Code section 1156.3 (all further statutory references are to that code unless otherwise indicated) seeking certification as the exclusive bargaining agent for employees at two ranches of employer in San Joaquin County. An election was held on October 24, 1975, approximately two months after the effective date of the Agricultural Labor Relations Act (ALRA). Of 420 eligible voters, 244 votes were cast: 131 for the UFW; 46 for no union; 66 ballots were challenged; and 1 ballot was void.

Employer promptly filed with the ALRB 24 objections to the election, 5 of which were dismissed by the board's Sacramento regional director, 17 more by the board's executive director, and the remaining 2 objections were set for hearing before a board investigative hearing examiner (IHE). The issues presented for hearing were (1) whether UFW organizers were present in excess numbers at the ranches prior to and on election day, and (2) whether organizers were present while employees were working. If any such access rule violations were established, the IHE was to determine whether they affected the result of the election by depriving employees of their free choice of a bargaining representative. (§ 1152.)

After the hearing, the IHE recommended dismissal of the two objections and the board, on April 23, 1978, adopted this recommendation and certified the union as the collective bargaining representative.

Employer, challenging the validity of the certification, refused to bargain with the UFW which thereupon filed with the board a claim of unfair labor

practices. (§ 1153, subds. (a), (e).) The board found that employer had violated the law, ordered the parties to bargain in good faith and imposed a "make-whole" remedy requiring employer to reimburse the employees. (*Triple E Produce Corp.* (1979) 5 A.L.R.B. No. 65.)

Employer thereupon petitioned the Court of Appeal for a writ of review. That court remanded the case to the board for reconsideration of its make-whole order in the light of our decision in *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1 [160 Cal.Rptr. 710, 603 P.2d 1306], wherein we discussed the appropriate standard for imposition of a make-whole remedy. The board then issued a "supplemental decision and revised order" rescinding its make-whole order while again affirming certification. The board acknowledged that it had earlier failed properly to consider or analyze the effect of employer's allegations that UFW organizers had threatened its workers with loss of their jobs if they did not vote for the union.

In connection with the claim of threat and coercion, the board found that UFW organizers spoke to employees who were waiting in their cars for work to begin on the day before and on the day of the election. The board further found, "During these brief conversations about the benefits of unionization, approximately ten employees were told that if they did not vote for the UFW they would be replaced on their job by union people. Although the witnesses consistently reported hearing the same statement, they did not explain their understanding of the statement or the context in which it was made." Specifically, five employees described both the substance of these statements and the effect on other employees.

Employee Lopez testified that, although UFW organizers did not speak directly to him, some of his coworkers discussed the fact that they were afraid to vote. Employee de la Rosa, a foreman, stated that "union people" told arriving workers that "if they didn't vote for Chavez that they were going to be replaced on the work." He also testified that "all" the people were afraid that they would lose their jobs, that the work crew members (approximately 80 to 100 workers) discussed their fears, and that no one wanted to vote. However, while "All the people murmured that they were afraid," the entire crew did vote.

Employee Herrerra, who was in the same crew as both Lopez and de la Rosa, said that upon arriving at work, she and her husband and other employees were approached in their car by union organizers. She was then told by the organizers that if she "didn't want to vote union, [she] was going to be replaced, there was somebody else to take care of [her] job."

Herrerra spoke with other workers on election day who also expressed fears about voting and losing their jobs. She did not know of any workers who did not vote.

Employee Estrada, a foreman, testified that upon arriving at work with six or seven family members in his car, they were approached by union people who told them to vote for the union or else they would lose their jobs. The Estrada family was also told that the union would obtain more benefits for them. Estrada discussed the statements with his family which expressed fear. Not having talked with other employees, Estrada did not know if other employees were similarly afraid.

Employee Mungia testified that when he arrived for work in a car with at least two others, he was also told by union representatives that if he did not vote for the union, he would be replaced. He stated that he was afraid of the union people "because they would take my work away from me . . ." but he did not vote because he "wasn't in the mood to do so." He also was told that the union would get him more benefits. All of the witnesses except Lopez also observed that when they were being so advised by the union organizers, union workers were also speaking with other employees in the vicinity.

The board concluded that statements made by union organizers implied that "the union knows how the workers vote and that the union somehow had power over job tenure and discharge, regardless of whether it wins the election." Notwithstanding the foregoing, the ALRB inferred that the "statements would be viewed by the employees as campaign propaganda which the Union could not effectuate." In its review of the record, the ALRB found that approximately 10 employees had been told that if they did not vote for the union they would be replaced, but also noted that although there was evidence that union organizers spoke to other workers, "There is no evidence that a significant number of . . . employees heard the questionable statement." Combining its inference that the statements were considered as propaganda only with a finding that only "a small number of employees heard the statements," the board then concluded that the statements "did not influence or affect the employees in their choice of bargaining representative," and dismissed the employer's objections. (*Triple E Produce Corporation* (1980) 6 A.L.R.B. No. 46.)

In considering the validity of the respective contentions, we are controlled by several principles. ■ Reviewing a determination of the ALRB, we have said that "The findings of the board with respect to questions of fact if supported by substantial evidence on the record considered as a whole

shall . . . be conclusive." (§ 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 345 [156 Cal.Rptr. 1, 595 P.2d 579].) ■ Because the ALRA (§ 1141 et seq.) in many respects parallels the provisions of the National Labor Relations Act (29 U.S.C. § 141 et seq.) the board is specifically directed to "follow applicable precedents" of the federal act. (§ 1148.) However, under certain circumstances, the board may diverge from federal precedents if the particular problems of labor relations within the agricultural context justify such treatment. Bearing in mind these underlying principles, we first examine the appropriate standard by which the ALRB considers allegations of misconduct during electoral proceedings.

### 1. *"Laboratory Conditions" Versus "Outcome-Determinative" Tests*

■ Both the UFW and ALRB urge that the ALRB has previously adopted, and should retain, an "outcome determinative" standard in analyzing labor elections. This test focuses on the results of the election, and on whether there is evidence "suggesting the activity had a potential for interfering with the employee's free choice." (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1, 22.) Both the board and union contrast this standard with the so-called "laboratory conditions" test first enunciated by the National Labor Relations Board (NLRB) in *General Shoe Corporation* (1948) 77 N.L.R.B. 124. They urge that this "outcome-determinative" test is more appropriate for agricultural labor elections because of the seasonal nature of the work and the transciency of the employees. (See *Samuel S. Vener Company* (1975) 1 A.L.R.B. No. 10; *D'Arrigo Bros. of California* (1977) 3 A.L.R.B. No. 37.) It is argued that in *J. R. Norton Co., supra,* at pages 21-24, we allowed the ALRB to deviate from NLRB standards in this area.

Our review of both NLRB and ALRB precedent persuades us that neither board has adhered to a pure "laboratory-conditions" test for elections. Of more relevance, neither the ALRB nor we have approved a test different from that utilized by the NLRB in reviewing the effect of *threats* on the election process.

In *General Shoe Corporation, supra,* the NLRB first expressed a review standard for elections which was modeled upon "a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." (77 N.L.R.B. at p. 127.) The sterility and perfection of the scientific setting conjured by this description is, however, far different from that which the NLRB has realistically required.

a.) *Campaign misrepresentations.* In two ALRB decisions, *Vener, supra,* and *D'Arrigo Bros., supra,* the board considered the following NLRB test for material misrepresentations first enunciated in *Hollywood Ceramics Company, Inc.* (1962) 140 N.L.R.B. 221. There, the NLRB described the applicable standard in reviewing such misrepresentations: "[A]n election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the elections." (*Id.,* at p. 224, fn. omitted.) Thus the NLRB looked to the substance, materiality, and timing of a statement to determine its realistic impact on employees' voting rights.

Subsequently, the NLRB adopted a new standard for reviewing campaign misrepresentations in *Midland National Life Insurance Co.* (1982) 263 N.L.R.B. [No. 24] —. Under *Midland,* an election is invalidated only if a party engages in "deceptive practices" such as the use of forged documents or other acts implicating the NLRB's own processes: "[W]e will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is." (*Ibid.,* at p. — [No. 24 at p. 22].) This new standard, which ignores the substance, timing, and materiality of the misrepresentations, has been retroactively applied by the NLRB to misrepresentations of both fact and law. (See *Sub-Zero Freezer Company, Inc.* (1982) 265 N.L.R.B. [No. 194] —; *Furr's, Inc.* (1982) 265 N.L.R.B. [No. 164] —.)

However, in adopting the new test, the NLRB made an important distinction. It carefully and explicitly acknowledged that, while altering the standard for evaluating the effect of campaign misrepresentations, it would "continue to protect against other campaign conduct, *such as threats,* promises, or the like, which interferes with employee free choice." (*Midland National Life Insurance Co., supra,* 263 N.L.R.B. at p. — [No. 24 at p. 22], italics added.) The NLRB's factoring out of different kinds of campaign conduct emphasizes that it has neither adhered closely to the ideal laboratory in reviewing elections, *nor has it applied the identical test to the several forms of asserted campaign misconduct.* Thus, present reliance upon the sole authority of *Vener* and *D'Arrigo Bros.* as well as our decision in *J.R. Norton Co.,* all *supras,* and all primarily concerned with campaign misrepresentations, is misplaced. The present case presents the more serious matter of direct *threats* to employees in the exercise of their vote.

Moreover, even in the context of misrepresentations, the ALRB itself has neither expressly nor uniformly applied a test different from *Hollywood Ceramics*. (See *Vener, supra,* 1 A.L.R.B. No. 10 at pp. 2-3 [the transitory nature of agricultural employment *may* make repeat of elections difficult and *may* justify adoption of a rule other than that used by NLRB; however, applying *Hollywood Ceramics* criteria, the ALRB upheld the election].) In *D'Arrigo Bros.*, the ALRB again cited the *General Shoe Corporation* standard and expressly noted that, as applied, it was not unrealistic but rather a standard "which takes into account the setting in which each election is conducted, that is the relevant 'laboratory,' in determining whether misconduct affecting the results of the election has occurred." (3 A.L.R.B. No. 37, at p. 3, fn. omitted.) Of more relevance was the board's conclusion that "We will impose that burden upon employees *only where the circumstances of the first election were such that employees could not express a free and uncoerced choice of a collective bargaining representative.*" (*Id.*, at p. 4, italics added.) This focus on the "atmosphere" of the election proceedings has significance in connection with the NLRB and ALRB approaches to threats. As we readily acknowledged in *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d, "the NLRA and ALRA purpose is not exclusively to promote collective bargaining, but to promote such bargaining by the employees' *freely chosen* representatives." (P. 34, italics in original.)

b.) *Threats.* In cases involving threats, the NLRB inquires whether the statements "reasonably tended to coerce and threaten the employees in the exercise of their organizational rights not to vote for the Union and interfered with the conduct of the election." (*A. Rebello Excavating Contractors* (1975) 219 N.L.R.B. 329, fn. omitted.) The ALRA, like the federal act, expressly gives employees the right to join labor organizations and to engage in concerted collective bargaining activities. It also, however, expressly permits employees "to refrain from any and all such activities." (§§ 1152, 1154.) In identical language, sections 1153 and 1154 prohibit employer and labor organization coercion of employees. In a case involving employer threats, the ALRB stressed that the test of whether statements "constitute an unlawful interference and/or threat is not the employees' reaction but whether the statements would reasonably tend to interfere with or restrain employees in the exercise of their rights guaranteed by the Act." (*Jack Brothers and McBurney, Inc.* (1978) 4 A.L.R.B. No. 18, at p. 3.)

From our analysis of the foregoing authorities, other relevant precedent, and the record before us, we are persuaded that the board's conclusion here that "the statements did not influence or affect the employees in their choice of a bargaining representative" cannot be sustained.

Characterizing the threats here as "the employee will be replaced simply for voting against the union," the board recognized that the reasonable implication from such a consequence was that the union would both know of each worker's vote and would exercise some control over job tenure. Nonetheless, relying on NLRB precedent, the board held that "organizer statements, which are not accompanied by some indication of the union's ability to carry out the suggested threat, are not likely to affect the employees' free choice of representative."

In reaching this conclusion, the board also relied on *Jack or Marion Radovich* (1976) 2 A.L.R.B. No. 12, and *Patterson Farms Inc.* (1976) 2 A.L.R.B. No. 59. In *Radovich,* the ALRB rejected an employer's objections based on testimony that four UFW workers approached two employees, a husband and wife, in the field and told them that if they did not sign authorization cards and the union won, they would be out of work. The employees told no one of the conversation. The ALRB reasoned that, because the two were the only ones who knew of the statements, no prohibited threatening atmosphere had been created. The board also noted that the threatening statements could reasonably have been interpreted as a reference to the fact that if the union won the election it would attempt to negotiate for a union security clause in its contract, permissible under section 1153, subdivision (c).

*Radovich* is distinguishable. There, an existing teamsters contract contained a similar union security clause from which fact the ALRB could reasonably infer that employees were therefore familiar with the clause.

Moreover, unlike the present case, the board in *Radovich* stressed the fact that the warnings had not been discussed with other workers. This difference is significant. The NLRB has consistently observed: "We have long held that statements made during an election can reasonably be expected to have been discussed, repeated, or disseminated among the employees, and, therefore, the impact of such statements will carry beyond the person to whom they are directed." (*United Broadcasting Company of New York* (1980) 248 N.L.R.B. 403, 404.) In *United Broadcasting,* a union steward told an employee that if he voted against the union his name would be placed on a blacklist and sent to other radio stations. (See also, *Steak House Meat Co.* (1973) 206 N.L.R.B. 28, 29 [threats by employee to 16-year-old coemployee to the effect that if young worker did not vote for union (1) he would be killed, and later (2) that the threatening employee would get back at him; NLRB found as fact that threats made to only one employee not conclusive, given nature of threats]; *Sav-On-Drugs, Inc.* (1977) 227 N.L.R.B. 1638,

1646 [assumes threats to a few employees were disseminated to other employees]; *Standard Knitting Mills, Inc.* (1968) 172 N.L.R.B. 1122 ["Experience has shown that statements made during election campaigns are the subject of discussion and repetition among the electorate"; statements by employer made to 4 employees out of 3,000 found to have an effect on election].) The ALRB declined to apply these applicable NLRB precedents despite its concession that there was evidence that union organizers had spoken to other workers besides those testifying, and that other workers had discussed the threats. Neither the board nor UFW has suggested any reason for rejecting the foregoing NLRB rule fashioned from the federal agency's long experience in labor elections.

Shortly after *Radovich*, in *Patterson Farms, Inc., supra*, 2 A.L.R.B. No. 59, the board considered the effect of a prounion employee's statement that if the union won everyone would be required to join the union or their jobs would be lost. The board noted that the issue "does not turn on the election results but rather upon an analysis of the character and circumstances of the objectionable conduct." (*Id.*, at p. 9.) This board approach closely parallels that utilized by the NLRB which has held that "The question of whether there has been unwarranted interference with free expression of choice does not turn on election results or the probable election results." (*Professional Research, Inc. d/b/a Westside Hospital* (1975) 218 N.L.R.B. 96, fn. omitted.)

The ALRB, in validating the *Patterson* election, noted that the alleged statement was even more likely than that in *Radovich* to be viewed as a permissible reference to a union security clause because the asserted threat in *Patterson* represented that *after* the election, regardless of an individual worker's vote, he would be required to join the union or lose his job. In contrast, as we have noted, the statements in the present case were unqualified assertions that failure to *vote* for the union would result in loss of jobs.

In similar fashion, in *Select Nursery* (1978) 4 A.L.R.B. No. 61, the hearing examiner concluded that a statement "perhaps those who don't sign [authorization cards] would be fired from their jobs" was merely a permissible reference to a security clause. The board rejected this reasoning concluding, "Had [the organizer] intended to make [the employee] aware of the effect of a union security agreement, he certainly could have done so more accurately and with a less threatening choice of words." (*Id.*, at p. 3.) We find significance in the fact that none of the employees who testified here described the organizers' statements as conditionally referring to any possible postelection requirements. With no exceptions, the employees all

said that the threatened drastic consequences would follow from the employees' unfavorable *voting*.

Even improper references to union security clauses may constitute threatening and unfair labor practices. In referring to a statement that a worker could not be permitted to resign from a union without losing his job where the collective bargaining agreement did not contain a union security clause, the NLRB has noted: "Such threat plainly interferes with [the employee's] right to refrain from any and all union activities and may be legitimized only by an agreement requiring membership in the Union." (*International Brotherhood of Electrical Workers,* Local 396 (1977) 229 N.L.R.B. 469, 470.) The federal board noted that it had previously found such statements coercive "because [they were] a threat of loss of employment reasonably calculated to have an effect on the listener without regard to the question of the Union's ability to carry out the threat." (*Ibid.*, citing *United Furniture Workers of America, Local 309* (1949) 81 N.L.R.B. 886, 887, fn. 3.)

Here, the ALRB freely acknowledged that it was reasonable to infer from the organizers' statements that the union could implement its threat. Nonetheless, the board interpreted the statements as mere propaganda, relying on NLRB cases in which the union was clearly unable to carry out its threat. These cases are readily distinguishable. Thus, in *Central Photocolor Co., Inc.* (1972) 195 N.L.R.B. 839, the federal board considered "alleged threats to two female employees and the spreading of rumors of misconduct and statements that if the Union won the election it would pressure employees who had voted against it to join the Union or lose their jobs." (*Ibid.*) It is readily apparent that, factually, *Photocolor* more closely resembles *Patterson, supra,* than the present case. Moreover, in *Photocolor* the NLRB placed heavy reliance upon the fact that the testimony revealed "that none of the threats or other statements were made by union agents or were otherwise attributable to the Union." (*Ibid.*) Here, of course, the ALRB concedes that the challenged statements were made by union organizers, and there is no contrary evidence.

Similarly, *Stimson Lumber Company* (1976) 224 N.L.R.B. 567, involved allegations that the union had sent letters to the employees before an election which "would have the employees believe that only through the Union's intervention could they receive the fruits of their labor in bounteous proportions, while conversely, absent the Union's intervention, they would receive but scraps at the whim of the Employer." (*Id.,* at p. 569.) The federal board found such statements to be mere campaign propaganda readily so identifiable. Such generalized puffing claims obviously did not constitute specific threats "within the Union's power to carry out." Nor were

they misrepresentations of a type condemned under the then applicable *Hollywood Ceramics* test. (*Ibid.*) The substance of the *Stimson* letters is very different from the direct threats in which the employees here were told that their votes alone would determine their fates.

The union readily concedes that union hiring halls are possible under both NLRA and ALRA procedures. The effect, of course, of this concession is to point out that the union may exercise control over the allocation of work. Moreover, the ALRA authorizes a union to seek a "good standing" clause in a collective bargaining agreement. Such a clause requires employees to be members of the union in good standing in order to be employed. In contrast, the NLRA permits only the lesser requirement of financial support for the union. Given the union hiring hall and the requirement of union membership in "good standing," under the ALRA it can reasonably be concluded that a victorious union may have greater powers over the job status of employees. In determining what are the reasonable inferences from the organizers' statements, it is important to bear in mind that the ALRB here acknowledged that "[*t*]*he implication is*" that the union would know how workers voted and had power over employees' jobs regardless of whether it won or lost a representative election.

c.) *Objective versus subjective standard.* In determining the effect of the threatening statements, we consider briefly the assertions of the union and board that the board properly applied an objective as opposed to subjective standard, the latter measuring the individual employees' reactions to the asserted misconduct. A companion contention is that the board should have rejected as uncorroborated hearsay the testimony of some of the employees that other workers were afraid.

In rejecting the subjective standard, the board has said that it must be ascertained "whether the statements would *reasonably tend to interfere* with or restrain employees in the exercise of their rights guaranteed by the Act." (*Jack Brothers and McBurney, Inc., supra,* 4 A.L.R.B. No. 18 at p. 3, italics added.) This definition follows that expressed by the federal agency in *Sav-On-Drugs, Inc., supra,* 227 NLRB 1638, in which a union was charged with threatening employees with job loss if they did not sign authorization cards. The NLRB noted that "Any contention that the threats did not coerce the employees because the Union could not effectuate them without the cooperation of the Respondent Employer or because the employees may not have believed it likely that the threats would be carried out, is not a defense to the unfair labor practice inasmuch as 'the test of coerciveness of a statement does not, of course, depend upon its actual effect upon listeners, but, rather upon whether it reasonably tends to have a coer-

cive effect.' [Citation.]'' (*Id.*, at p. 1644; *International Brotherhood of Electrical Workers, Local 396, supra,* 229 N.L.R.B. at p. 470.)

Thus, in assessing the effect of the threat, we do not inquire into the subjective individual reactions of a particular employee or group thereof, but rather determine whether the statements, considering the circumstances surrounding their utterance, reasonably tended to create an atmosphere of fear and coercion.

■ Furthermore, contrary to the contentions of ALRB and the union, the testimony regarding the effects of threats on the witnesses and their coworkers did not constitute inadmissible hearsay which must be totally disregarded. Section 20370, subdivision (c) of title 8 of the California Administrative Code provides that in ALRB hearings "[h]earsay evidence may be used for the purpose of supplementing or explaining other evidence, but shall not be sufficient in itself to support a finding unless it would be admissible in civil actions." The ALRB has held "that while hearsay testimony is admissible, mere uncorroborated hearsay evidence does not constitute substantial evidence to support a finding of the Board." (*O.P. Murphy & Sons* (1977) 3 A.L.R.B. No. 26, p. 6, fn. 3.) Branding the evidence as hearsay, therefore, does not affect its admissibility but only its weight if there is controversial evidence. (*Ibid.*) The testimony of some employees that other workers were afraid thus would not, standing alone, be sufficient to invalidate the election. However, the testimony here was not only admissible but clearly supports application of the NLRB rule, to which we have previously adverted, that statements made to a handful of employees may reasonably be anticipated to reach a larger part of the work force.

■ In summary, in determining whether the board's decision was supported by substantial evidence, we consider (1) the uncontradicted statements by the employees describing the nature and content of the threats made to them, (2) the board's finding that such threats were indeed made, (3) the board's conclusion regarding the statements' implications that the union would know how the employees voted and would exercise some control over job allocation, and (4) applicable NLRB and ALRB precedents. We find unsupportable the ALRB's leap from its reasonable inferences regarding the threatening nature of the statements to its ultimate conclusion that the threats were merely campaign propaganda. Only 244 of 420 eligible voters actually voted. At the hearing, the UFW evidence was directed only to the issue of whether the statements were made at all. This was resolved adversely to the union, the hearing examiner and the ALRB clearly having given credence to the testimony of the employees that the statements were

indeed made. The only evidence presented on the *effect* of the statements was that they did induce fear on the part of the workers.

The threats were pervasive in nature. The statements were made to arriving workers at the beginning of the working day and thereafter were discussed by the workers in the field (compare *Radovich, supra,* 2 A.L.R.B. No. 12). The statements tied job loss to the act of *voting* rather than to possible collateral and subsequent consequences of a union victory. These facts and circumstances in combination with the total lack of any substantiating evidence to the effect that the workers reasonably would have regarded the threats as innocuous propaganda, created an impermissible atmosphere of fear and coercion surrounding the balloting which rendered the election invalid. Accordingly, we do not indulge in fruitless speculation as to the precise number of votes affected. (See *Sav-On-Drugs, Inc., supra,* 227 N.L.R.B. at p. 1646 and fn. 32, and cases cited therein.)

Justice Carr, for a unanimous Court of Appeal, described very well the applicable principles: "The integrity of the election was irreversibly damaged by threats of economic reprisal made by union organizers to employees on and about the day of election. It is fundamental that the inviolability of the free election process be preserved; hence, we are disinclined to set precedent tacitly condoning such campaign tactics. To deem acceptable these activities would invite similar activities in the future by competing unions and employers. Such perversion of the election process inevitably leads to the detriment of the workers and frustrates the express purpose of the Agricultural Labor Relations Act." Because of our conclusion that the threats here created an impermissible atmosphere of fear, pointed at the very integrity of the election process, we accordingly do not reach the other objections to the board's decision.

The decision of the ALRB is annulled. The board is ordered to vacate its orders in 5 A.L.R.B. No. 65 (1979) and 6 A.L.R.B. No. 46 (1980), and to sustain employer's objections regarding threats during periods of access. The ALRB is also ordered to decertify the UFW as the exclusive bargaining representative because of the invalid election.

Kaus, J., Grossfeld, J.,* and Woolpert (W. R.), J.,* concurred.

**MOSK, J.,** Concurring and Dissenting.—The employer appears to have established that the well was poisoned. But we do not know how many persons drank from it.

---

*Assigned by the Chairperson of the Judicial Council.

It is a regrettable fact of democratic life that we seldom achieve laboratory purity in elections. Though I do not condone such activity, unfortunately there seem to be falsehoods, hyperbole and grossly exaggerated claims in almost every campaign. To invalidate an election on those grounds there must be a showing by substantial evidence that the offending conduct was likely to have had a significant coercive or intimidating effect on those engaged in the voting process. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 24 [160 Cal.Rptr. 710, 603 P.2d 1306].) The board did not conclude, as do the majority here, that the union activities "created an impermissible atmosphere of fear and coercion surrounding the balloting which rendered the election invalid." (*Ante,* at p. 56.)

Therefore, while this court should disapprove the campaign tactics involved herein, I would not go as far as the majority in invalidating the election and certification—yet. I would annul and remand to the board with directions to take additional testimony to establish more convincingly whether the conduct of the union did or did not affect the election process, and to determine whether the circumstances dictate that a new election be held.

**BROUSSARD, Acting C. J.**—I dissent. I do not object to the majority's announced test for review of campaign threats—"whether the statements would reasonably tend to interfere with or restrain employees in the exercise of their rights guaranteed by the Act." (*Jack Brothers and McBurney, Inc.* (1978) 4 A.L.R.B. No. 18 at p. 3.) However, in applying the test, the majority violates a fundamental principle of judicial review in substituting its own judgment for that of the board in order to justify the attack on findings supported by substantial evidence. The majority freely acknowledges that "[t]he findings of the board with respect to questions of fact if supported by substantial evidence on the record as a whole shall . . . be conclusive." (Lab. Code, § 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 345 [156 Cal.Rptr. 1, 595 P.2d 579].) There is substantial evidence in the record to support the conclusion that employees would consider the statements to be campaign propaganda which the union could not effectuate, and the board did not abuse its discretion in concluding in effect that the statements did not reasonably tend to interfere with the employees' free exercise of their rights under the Agricultural Labor Relations Act.

The test utilized by the board to review the statements has already been approved by this court in *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 22 [160 Cal.Rptr. 710, 603 P.2d 1306]. That test focuses on whether there is evidence "suggesting the activity had a potential

for interfering with the employee's free choice." The test stated by the majority for cases involving campaign threats—"whether the statements would reasonably tend to interfere with or restrain employees in the exercise of their rights guaranteed by the Act"—is not substantively different from the test already approved by this court for measuring other election misconduct and applied by the board in the instant case.

The board said "the statements indicate that the employee will be replaced simply for voting against the union. The implication is that the union knows how the workers vote and that the union somehow has power over job tenure or discharge, regardless of whether it wins the election. [¶] The NLRB has held that organizer statements, which are not accompanied by some indication of the union's ability to carry out the suggested threat, are not likely to affect the employees' free choice of representative. [Citations.] Given the circumstances herein and the character of the statements made, we find that such statements would be viewed by the employees as campaign propaganda which the Union could not effectuate. Further, the record shows that only a small number of employees heard the statements. Therefore, we conclude that such statements did not influence or affect the employees in their choice of a bargaining representative."

The obvious import of the board's opinion is that it would be unreasonable to conclude that in a secret election the union would know how people vote and be able to influence whether particular voters retained their jobs even if the union lost the election. Finding such conclusion is *not* reasonable, the board could properly refuse to accept it. Despite the board's obvious disbelief that the voters could reasonably be coerced by statements implying that "the employee will be replaced simply for voting against the union," (maj. opn. at p. 51), the majority amazingly declares that "the Board recognized that the reasonable implication from such a consequence was that the union would both know of each worker's vote and would exercise some control over job tenure." The majority having fundamentally misread the board opinion (see maj. opn. at pp. 51, 53, 54), it is not surprising that it concludes that the board erred in dismissing the employer's objections.

The determination whether statements reasonably tend to produce a coercive effect on the free exercise of employees' rights is a judgment call better left to the expertise of the board. It involves a decision that requires the drawing of inferences based on the peculiar facts of each case placed in the context of the accumulated experience of the board. (*Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 327 [165 Cal.Rptr. 887].) "[W]hether certain words do contain a threat of reprisal

and would reasonably tend to restrain or interfere with an employee's exercise of a protected right is a matter that calls for some detailed understanding of the agricultural labor scene, the peculiar relationship between a field laborer and supervisor with power to hire and fire the non-English speaking agricultural migrant laborers, as well as the nature of the symbols used to communicate. These questions presented to the Board were of such nature as to call for expertise. Presumptively, the Board is equipped or informed by experience to deal with this specialized field of knowledge; therefore their findings carry the authority of an experience which the courts do not possess and therefore must respect. (*Universal Camera Corp.* v. *Labor Board* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467, 71 S.Ct. 456].)" (*Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd., supra,* 107 Cal.App.3d 317, 340 (conc. opn. of Staniforth, J.).) The deference to be given board inferences and conclusions is equally applicable to situations involving review of alleged misconduct by union organizers.

Although this court might disagree with the board as to the inferences to be drawn from the evidence in this case, there is substantial evidence in the record to support the inferences drawn by the board; that being the case, we should not disturb its judgment. "[I]f there is evidence to support each of two conflicting views, the findings of the Board must be allowed to stand despite the fact that we might have reached the opposite conclusion on our own. [Citations.]" (*N. L. R. B.* v. *Pacific Grinding Wheel Co., Inc.* (9th Cir. 1978) 572 F.2d 1343, 1347.)

Because it is unlikely that there would ever be direct evidence that particular conduct influenced the employees in their choice of a bargaining representative, the board must necessarily draw inferences from the character and circumstances of the objectionable conduct. In analyzing the conduct in a particular case, the board must be permitted to calculate the effect of misconduct based on an objective test developed from the board's cumulative experience with union representation contests. Otherwise, objection hearings would degenerate into extended parades of witnesses for the union and the employer, each testifying whether he or she was or was not intimidated by the conduct. Moreover, such an inquiry could result in violation of the right of employees to secrecy of the ballot.

The board concluded that the statements could not be said to reasonably tend to interfere with the employees in the exercise of their rights, because they were not accompanied by some indication of the union's ability to carry out the threat. Because the statements here were not tied to any conduct by

the employees which would verify their responses to the statements, the statements are clearly less coercive than those requiring some overt act such as signing union authorization cards. Moreover, the board correctly concluded that such statements would not reasonably be coercive when they were not conditioned on the union winning the election, because the union was obviously powerless to effectuate threats if it lost the election.

The majority rejects the board's analysis of the statements in favor of its own conclusions based on its misreading of the board opinion. The majority's attempt to distinguish the cases relied on by the board does nothing to undercut its conclusion that the statements would be viewed as campaign propaganda which the union could not effectuate.

Nor are the board's conclusions undercut by the majority's invocation of the supposed National Labor Relations Board (NLRB) "rule" that " 'statements made during an election can reasonably be expected to have been discussed, repeated, or disseminated among the employees . . . .' " (Maj. opn. at pp. 52-53.) The majority portrays this statement as if it is a general NLRB rule, but examination of the cases cited to support the proposition suggests that the "rule" has been applied in quite limited circumstances dissimilar to those here.

The threat made in *United Broadcasting Company of New York* (1980) 248 N.L.R.B. 403 was made to one employee in a bargaining unit of six employees of whom four cast ballots. In *Standard Knitting Mills, Inc.* (1968) 172 N.L.R.B. 1122, although the statements were made to 4 employees out of 3,000, the union lost the election by only 17 to 21 votes. "In essence, therefore, the impact of the misconduct is the same as if the entire unit consisted of, at most, 21 employees." (172 N.L.R.B. at p. 1123.) The threats made in *Sav-On-Drugs* (1977) 227 N.L.R.B. 1638 were made to 6 employees in a unit of 38. None of these cases represent "applicable NLRB precedents" warranting the majority criticism of the board. (Maj. opn. at p. 52.) In the instant case there were 420 eligible voters, the threats were only made to a few, and the election was not close.

Finally, the majority improperly elevates its application of the supposed NLRB presumption of dissemination to the status of evidence. By this device, the majority concludes that the testimony regarding the effects of threats on witnesses and coworkers supports a finding that the statements created an atmosphere of fear and coercion. The majority reaches this con-

clusion despite the testimony of the employer's witnesses that they knew of no workers who failed to vote because of the alleged intimidation.

As the majority acknowledges, "[h]earsay evidence may be used for the purpose of supplementing or explaining *other evidence,* but shall not be sufficient in itself to support a finding unless it would be admissible in civil actions." (Cal. Admin. Code, tit. 8, § 20370, subd. (c), italics added.) The majority also concedes that the testimony that other workers were afraid would not, standing alone, be sufficient to invalidate the election. (Maj. opn. at p. 55.) But, the majority couples the hearsay evidence with the NLRB presumption to create its own finding that the statements induced fear on the part of the workers (maj. opn. at p. 56).

The fatal flaw in the majority's reasoning is that a presumption, even properly applied, is not evidence. (Evid. Code, § 600, subd. (a); *People* v. *Hedrick* (1980) 105 Cal.App.3d 166, 171 [164 Cal.Rptr. 169].) Thus, the presumption does not substitute for the "other evidence" necessary to support the majority's "finding." The majority has merely bootstrapped hearsay evidence and an inapplicable presumption to support its judgment, not otherwise supported by the record, that the statements "created an impermissible atmosphere of fear." (Maj. opn. at p. 56.)

The majority's purpose in this case seems clear. It is determined that any threats against employees necessarily are coercive and cause to invalidate the election, despite the context in which they were made, the number of employees who heard the threats, the patent inability of the union to effectuate the threats, or the large vote in favor of the union. Thus the majority rejects the reasonable inferences of the board in favor of its own conclusion that threats necessarily interfere with or restrain employees in the exercise of their rights guaranteed by the act.

Of course, such conduct as occurred in this case is not to be condoned. However, I do not foresee upholding the board's decision in this case as an invitation to similar conduct in the future by competing unions and employers. The board is best equipped to evaluate such conduct based on its experience in the field of agricultural labor relations, and to refuse to certify an election when "misconduct affecting the results of the election occurred." (Lab. Code, § 1156.3, subd. (c). When the record supports the board's findings and inferences, as in this case, its decision should not be upset merely because this court has a different view of the "proper" result.

I conclude that there is substantial evidence to support the findings and inferences of the board that the statements did not influence or affect the

employees in their choice of a bargaining representative. Thus, I would affirm the decision of the Agricultural Labor Relations Board.

Reynoso, J., concurred.

The petitions of respondent and real party in interest for a rehearing were denied January 19, 1984. Bird, C. J., did not participate therein. Broussard, J., and Reynoso, J., were of the opinion that the petitions should be granted.