[Civ. Nos. 26587, 26609. Fourth Dist., Div. One. Apr. 2, 1984.]

CARL JOSEPH MAGGIO, INC., et al., Petitioners, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

[Civ. No. 26605. Fourth Dist., Div. One. Apr. 2, 1984.]

J. J. CROSETTI COMPANY, INC., et al., Petitioners, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest

44

## Counsel

Gray, Cary, Ames & Frye, Richard A. Paul, Merrill F. Storms, Jr., Thomas B. McAfee, Theodore H. Hinderaker III, Littler, Mendelson, Fastiff & Tichy, Scott A. Wilson, Van A. Goodwin, Marion I. Quesenbery and Dressler, Quesenbery, Laws & Barsamian for Petitioners.

Thomas F. Olson and Carl G. Borden as Amici Curiae on behalf of Petitioners.

Manuel M. Medeiros, Daniel G. Stone, Ruth Rokeach, Cathy Christian and Deborah Escobedo for Respondent.

Dianna Lyons, Federico G. Chavez, Daniel A. Garcia, Ellen J. Eggers, Ira Gottlieb, Carmen S. Flores and Wendy Sones for Real Party in Interest.

## Opinion

**COLOGNE, J.**—Two separate groups of petitioners (Carl Joseph Maggio, Inc., et al., and J. J. Crosetti Company, Inc., et al.) seek review of the final decision and order of the Agricultural Labor Relations Board (Board) in *Admiral Packing Company, et al.* (1981) 7 A.L.R.B. No. 43. Petitioners are all agricultural employers subject to the provisions of the Agricultural Labor Relations Act (Act) (Lab. Code, § 1140 et seq.). The petitions have been consolidated by order of the court.

The underlying action arose from the inability of the United Farm Workers of America, AFL-CIO (UFW) and a major portion of California's vegetable growing industry, including petitioners,[1] to negotiate a collective bargaining agreement. The UFW was certified as the collective bargaining rep-

---

[1] At the time of the hearing before the Board, the respondents were growers and/or harvesters of one or more crops of vegetables and included Admiral Packing Company, Arrow Lettuce Company, Associated Produce Distributors, California Coastal Farms, Colace Brothers, J. J. Crosetti Company, Inc., Gonzales Packing Company, Gourmet Harvesting & Packing Company, Green Valley Produce Cooperative, Growers Exchange, Inc., Harden Farms of California, the Hubbard Company, Lu-Ette Farms, Inc., Carl Joseph Maggio, Inc., Joe Maggio, Inc., Mann Packing Company, Inc., Martori Brothers Distributors, Meyer Tomatoes, O. P. Murphy & Sons, Oshita, Inc., Mario Saikhon, Inc., Salinas Marketing Cooperative, Senini Arizona, Inc., Sun Harvest, Inc., Valley Harvest Distributors, Inc., Veg-Pak, Inc., Vessey & Company, Inc., and West Coast Farms. Some of their firms operated in Salinas, others in Imperial Valley, and a few in both areas.

Many of these companies later reached an agreement with the union before the case was heard by this court, and were dismissed from the action.

resentative for the employees of each of the respondent companies for each of the several years 1975 to 1978, and had commenced bargaining for a new contract. After three months and twenty-two sessions of bargaining held to effect an agreement for the ensuing years, the parties apparently could not make substantial progress and the growers' negotiators declared impasse had been reached.

One day after negotiations broke off, the UFW filed unfair labor practice charges against 28 of the growers, claiming they had refused to bargain in good faith. After the resultant hearing of those charges, the administrative law officer (ALO) found the employers had violated section 1153, subds. (a) and (e) of the Act by failing and refusing to negotiate with the union in good faith.[2] The Board, over a vigorous dissent, affirmed with a few modifications the ALO's decision.

Collective bargaining agreements had been entered into the four earlier years between the UFW and all but two of the companies. The agreements were all substantially identical to the contract the UFW and Sun Harvest, Inc. had executed. This contract became known as the "master contract." There were, however, "local supplements" containing provisions peculiar to individual employers. All of the agreements had expiration dates of either December 1, 1978, or January 1, 1979.

Negotiations for a new master contract and local supplements opened on November 27, 1978. With the UFW's consent, the companies engaged in group bargaining. Each employer retained independent bargaining and decision-making power, and had the right to withdraw from the group at any time. Attorney Andrew Church was the chief negotiator for the employers. Principals and representatives of the companies and trade associations participated in the negotiations for the employers.

The UFW was represented by staff negotiators David Burciaga and Ann Smith, a bargaining committee composed of worker representatives from the companies and, at times, Marshall Ganz, who directed preparation of the union's economic proposal. Union president Cesar Chavez attended the opening negotiation session.

At the first negotiating session, held in El Centro, California, on November 27, 1978, the union presented a complete language proposal, dealing

---

[2]In a supplemental decision arising from a charge filed by the employers, the ALO found the UFW had also violated the Act by failing to provide certain requested information. This finding is not contested in this appeal.

with such noneconomic concerns as seniority, mechanization, union security and hiring. The proposal changed over one-half of the 43 articles of the old master contract. The employers claimed a number of these changes would have a significant impact on the operation of their companies. For the remainder of the meeting, the parties discussed the proposal and also considered the UFW's request for information.

At the next two meetings, on December 7 and 8, the parties continued discussion of the UFW's language proposal. The employers had not submitted any proposals yet, indicating they would not be willing to do so until the union presented a complete proposal including economics. The next four meetings scheduled for December, and one planned for January 4, were cancelled by the union because it had not yet prepared its economic proposal. Employer and union representatives did keep in touch during this time, however, and it was agreed to extend the existing collective bargaining agreements until January 15, 1979. In the meantime, both sides agreed not to take the issues to the public or discuss them with the press, but to continue to negotiate at the bargaining table.

On January 5, 1979, the UFW presented an extensive economic proposal to the employers. The proposal called for a one-year contract with substantial pay increases for all field workers. The proposal, for example, called for the hourly rate for general laborers to increase from $3.70 to $5.25, for cutters on lettuce harvest machines from $3.78 to $6, and for tractor drivers from $4.52 to $8.25; for piece rate workers, there would be an increase from 57 cents to 87 cents per box of hand-packed lettuce, and from 85 cents to $1.41 per box of celery. Marshall Ganz explained the reasons for the wage increases, noting the earnings of many of the workers had not kept abreast of inflation, the failure of the agricultural workers' conditions to improve at the same rate as other union members in the state and the generally prosperous year enjoyed by the vegetable industry.

The UFW's proposal also provided for longer rest periods, an additional five holidays, overtime pay, improved vacation rights, cost of living adjustments, standby and reporting pay, guaranteed minimum workdays and workweeks, mileage and expense allowances, and increased contributions to medical and pension plans. Employers estimated their labor cost under the proposal would be increased by 128 to 196 percent. UFW does not contest this estimate.

The balance of this negotiating session was spent explaining the proposal and discussing the possibility of further extensions of the existing contracts.

The UFW's proposal was still not complete, with job descriptions and local issues still to be proffered.

Contrary to their general agreement not to make public the details of the negotiations, UFW had leaflets printed and distributed to the farm workers. The next meeting, on January 11, 1979, Andrew Church complained of the UFW's distribution of a leaflet to farm workers a week earlier, which accused the employers of bad faith negotiating and of trying to divide the workers. Church said the leaflet undermined the spirit of the negotiations and was especially unfair as it was released even before the union had made their economic offer.

The parties then attempted to clarify some parts of the union's economic proposal. The employers also again asked for an extension of the present contracts beyond January 15, but the union would not assent to this. At the end of the meeting, the employers presented a response to the union's language proposal. This counterproposal rejected almost all of the UFW's proposed changes, and contained alternative modifications which would eliminate some of the union prerogatives acquired under the old master contract.

The following day, January 12, 1979, an ad placed by UFW appeared in La Voz, a Spanish language newspaper published in Mexicali. The ad revealed the details of the union's demands.

When the negotiations resumed on January 12, Church expressed his objection to the union's placing of a double-page advertisement in La Voz. Church said the ad violated the agreement the parties had entered into before the negotiations had begun. Ganz contended the advertisement was not a comment on the status of negotiations but was only intended to inform union members of the proposal.

The general counsel of the union's health, welfare and pension funds talked about the funds' benefits and operations. He did not, however, give all the information requested by the employers regarding the funds. The employers' proposal of the day before was then discussed. At this meeting, the union also suggested conducting the negotiations on a daily basis, but the employers rejected this saying they had other commitments.

The next three meetings were held in Los Angeles on January 16, 17 and 18. The union was represented only by David Burciaga and one worker representative. The employers took exception to this, saying this lack of representation could not produce any sort of firm agreement from the union. Burciaga said the union would have nothing new to offer until the employers

presented an economic offer. The employers informed the UFW their economic counterproposal would comply with President Carter's recently promulgated wage and price guidelines,[3] a product of the administration's efforts to combat inflation. The parties debated the applicability of the guidelines, which were voluntary but carried possible sanctions for noncompliance. The employers urged the union to let them have a representative from the Council on Wage and Price Stability (CWPS) come to one of the bargaining sessions and explain the guidelines. They also asked the union to join in an invitation to a representative from the Federal Mediation and Conciliation Service (FMCS) to attend the negotiations. These requests were rejected by the union.

Toward the end of the meeting on January 18, the employers presented their economic proposal. It provided for an annual pay increase—for wages, hours, fringe benefits and working conditions—of 7 percent in each of three years, to be allocated between the wages and benefits as the union saw fit. The proposal was consistent with the President's wage and price guidelines. The parties then discussed when the union's proposal on local issues would be presented, and scheduled meetings for the next week in San Diego.

Since the union had not agreed to extend any of the old collective bargaining agreements—which contained no-strike provisions—past January 15, they had all expired. On January 19, the employees of California Coastal Farms voted to strike and began picketing. Vessey and Company, Inc. was struck the next day, and on January 22 Mario Saikhon, Inc. began to be picketed. Strikes against the employers participating in the bargaining group continued throughout the negotiations. The strikes were at times violent, with many alleged incidents of rock throwing, property damage, intimidation of replacement workers, trespassing and confrontations with police.

January 22, 1979, the "Committee for Fair Negotiations" (CFN), a group chiefly comprised of representatives from the companies involved in the negotiations, placed an advertisement in La Voz. The advertisement in Spanish was addressed to the farmworkers of Imperial Valley. It said the employers "want to listen" to the farmworkers and "want to do what is right." It mentioned President Carter's guidelines and proposed the negotiations be continuous and open to the public. The employers also sent a telegram to the union making the same proposal. At about the same time as

---

[3]The guidelines were set forth in Executive Order 12092, and detailed in 43 Federal Register 60772 (Dec. 28, 1978), and generally limited salary increases to 7 percent per year.

the CFN's advertisement appeared, the UFW distributed another leaflet, informing the union members about the strike and stating it was declared after "receiving the miserable and inadequate economic proposal" from the employers.

The next bargaining session, on January 23, opened with Church criticizing the union's decision to institute the strikes. He did not, however, threaten to stop the negotiations because of this activity. The union then responded to the employers' telegram, indicating they were willing to meet continuously and make the negotiations open to the public. The employers later said this proposal was conditioned on the union's agreeing to allow a FMCS mediator to participate in the negotiations. The union would not agree to this and rejected the proposal.

The parties then discussed their requests for information and pointed out information which had not been supplied. After that, the union tried to get the employers to clarify their economic proposal. The employers, however, said it would do so but would also like having someone from the CWPS come and explain the operation of the guidelines and the possible sanctions for noncompliance. The union agreed to join in an invitation to the CWPS to have a representative come to talk with the parties. When they met again the following day, however, Ann Smith retracted her consent to the invitation, saying it was incumbent upon the employers to explain their own proposal. The union then presented a proposal on local issues and crop supplements. Later in the day, the employers presented a more detailed version of their economic offer, specifying dollar amounts.

At the next meeting on January 25, the employers gave the union specific dollar amounts for their proposed contributions to the union's benefit plans. The contributions, including these benefits, amounted to a 7 percent per year increase. The employers made it clear their counterproposal was now essentially complete. The meeting ended with the parties discussing the union's proposals of the day before.

The following week's meetings were in San Diego on January 30 and 31 and February 1 and 2. In the first meeting, the employers complained about picket line violence. The language proposals of both sides were discussed throughout the week, with some agreements being reached, but major differences remained on salary schedules. On the last day of these sessions, the union made a few modest oral modifications of its economic proposal in response to the employers' proposal, affecting such areas as overtime pay, jury duty, witness pay and travel pay.

On February 6, the CFW placed a second ad in the Salinas Californian, in English, and criticized the union's wage demands, saying the employers had offered the maximum increase in wages possible under President Carter's guidelines. It stated the employers were willing to have the MCS help resolve the differences.

The parties met again on February 6 in El Centro. The employers rejected the union's oral modifications of its economic proposal made at the last meeting. The union said it was awaiting a more serious economic offer from the companies, and again rejected a suggestion to call in a federal mediator. The meeting adjourned after both sides agreed to put their current positions in writing.

The next day the union and the employers exchanged and discussed their written-out positions. Each side found the other's economics completely unacceptable. The parties asked about information which still had not been supplied pursuant to requests, and the UFW submitted a job description proposal. Also on this date another CFN advertisement appeared in La Voz, again attacking the union's decision to strike and informing the workers about the employers' offer.

On February 8, the parties met again and considered health and safety provisions. Both sides made some movement on issues relating to the use of pesticides.

Meetings scheduled for February 13 and 14 were cancelled by the UFW in order to attend funeral services for Rufino Contreras, who had been shot and killed on February 10 during a strike-related confrontation. Around February 10 and 13, the UFW distributed leaflets concerning Contreras' death, accusing one of the company's foremen of responsibility for the killing. It should be noted, however, the foreman was never tried for the offense. February 12, another CFN advertisement appeared in La Voz, condemning the strike violence and asking Cesar Chavez to call for an end to the strikes.

On February 19 and 20, the parties continued discussion of the health and safety issues, with some compromise being made by both sides. At the end of the meeting on the 20th, the employers asked if the union had any new proposals to make. The union told the employers at this meeting the employers would have to make significant movement on economics before it would make any more concessions.

The next day, February 21, the employers presented a complete contract to the union and three of the employer representatives signed it. The con-

tract modified the employers' earlier economic offer. Instead of a 7 percent increase for each of three years, the offer was "front-loaded," that is, there was approximately an 11 percent increase in salaries in the first year of the contract, a 3 percent increase in the second year and a 7 percent increase in the third year. Over the three-year period, then, the employers' latest proposal offered a modest increase in wages over the February 7 proposal, but allowed the employers to maintain they were still complying with the President's wage guidelines. The contract provided some increase over the previous proposal in contributions to the benefit plans. It rejected the union's proposals on local supplements and job descriptions. Thus, the language provisions were largely the same as those made in the earlier proposal except for the incorporation of health and safety modifications which the employers had agreed to.

The employers indicated this would be their final offer unless there was a meaningful response from the union. The meeting ended after a brief discussion of the employers' proposal, and the union said it would have a response in a week.

During the week, three more CFN advertisements were run in La Voz. Two of the ads depicted Cesar Chavez in an uncomplimentary light. One accused Chavez of lying to the workers and was accompanied by a cartoon showing him wielding a whip over the workers and screaming at them to continue the strike. The other showed an overweight Chavez sitting atop a pile of money bags ignoring the pleas of starving farmworkers, and accused him of misdirecting funds from the union benefit plans.

At the start of the next meeting on February 28, one of the employer representatives gave the union some requested information regarding the Imperial Valley employers. Ann Smith then presented a new UFW proposal. It contained no changes in the language provisions originally suggested by the union, but did make a small reduction in the proposed wages which was generally conceded to be 5 percent or less. It was very apparent no significant progress had been made.

At this point, the parties were still very far apart on economic issues, i.e., 22 percent increase over three years as offered by the employers as opposed to a 123-190 percent increase demanded by the union. In addition, they were not close to agreement, or had only minimal discussions on such major noneconomic issues as union security, hiring, seniority and mechanization.

The employers took a break in order to consider the new proposal, after which Church said the employers were not willing to make any further

movement in response to the union's offer. The union was then asked whether it had anything else it wanted considered or any other proposals to make. When the union replied it did not, Church said, "Apparently we have reached an impasse." At the time, no representative of the union or the employers disputed this statement and later at the August meeting the union representatives admitted it was apparent they had reached an impasse at this February meeting. The meeting and the negotiations ended after the parties agreed to contact each other if there was any change in position. The next day, March 1, the union filed unfair labor practice charges against the employers, alleging they had bargained in bad faith.

It is significant to note neither party refused to attend further meetings and, in June 1979, negotiations resumed with the Salinas Valley companies after they made a new proposal to the union. These negotiations eventually led to contracts with all but three of the Salinas growers. The Imperial Valley growers told the union they were available to meet but would not join in the Salinas growers' offer, and remained committed to the February 21 proposal.

In August 1979, the union and the Imperial Valley growers had a brief meeting. Neither side had any new proposals to make and the meeting was quickly ended.

The findings of the Board as to questions of fact are conclusive if supported by substantial evidence on the record considered as a whole (Lab. Code, § 1160.8; *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727 [175 Cal.Rptr. 626, 631 P.2d 60]). The standard of review by this court is met if there is relevant evidence in the record which a reasonable mind might accept in support of the findings (*Kawano, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 106 Cal.App.3d 937, 943 [165 Cal.Rptr. 492]). The United States Supreme Court, however, gives us further guidance in *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 487-488 [95 L.Ed. 456, 467, 71 S.Ct. 456, 464-465]: "Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. . . .

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

We are cautioned against a rubber stamp approach to this undertaking. "This 'limited' scope of review does not, however, require us to abdicate our responsibility to the extent of merely 'rubber-stamping' our affirmance of the Board's decision when, after full review of the record, including the evidence opposed to the Board's views, we are unable conscientiously to conclude that the evidence supporting such decision is substantial." (*N. L. R. B.* v. *O. A. Fuller Super Markets, Inc.* (5th Cir. 1967) 374 F.2d 197, 200; *Universal Camera Corp.* v. *Labor Bd., supra,* 340 U.S. 474, 488 [95 L.Ed. 456, 467].)

█ "Substantial evidence" does not mean "any evidence" (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 930-931 [156 Cal.Rptr. 152]), and is not established by mere suspicions of unlawful motivation (*Lozano Enterprises* v. *N. L. R. B.* (9th Cir. 1966) 357 F.2d 500, 503). General counsel of the Board has the burden of proving unlawful conduct (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 757 [195 Cal.Rptr. 651, 670 P.2d 305]), and such conduct is not lightly to be inferred (*N. L. R. B.* v. *Federal Pacific Electric Company* (5th Cir. 1971) 441 F.2d 765, 770).

This role of the court in search for "substantial evidence" was reiterated with approval in an ALRB setting in *Merrill Farms* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 176, 182 [169 Cal.Rptr. 774].

█ The court is also to be guided in its review of Board orders by decisions under the National Labor Relations Act (29 U.S.C.A. § 151 et seq.), on which the Agricultural Labor Relations Act was modeled (Lab.

Code, § 1148; and see *Triple E Produce Corp.* v. *Agricultural Labor Relations Bd.* (1983) 35 Cal.3d 42, 48 [196 Cal.Rptr. 518, 671 P.2d 1260]; *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 855-856 [176 Cal.Rptr. 753, 633 P.2d 949]).

## EMPLOYERS' ALLEGED FAILURE TO BARGAIN IN GOOD FAITH

The ALO determined the employers had been bargaining in bad faith before their declaration of impasse. The ALO found some evidence of this in the employers' failure to produce all of the information requested by the UFW before December 8, 1978; in their demand for a complete proposal from the UFW, including economic provisions, before they would make a counterproposal; and in the employers' first counterproposal, which rejected all of the union's proposed changes and took away union prerogatives obtained in previous contracts.

The Board held the ALO erred in making these findings. The union was in part responsible for the employers' delay in supplying information, it found, and the employers' demand for a complete proposal was a legitimate bargaining tactic. Further, the Board stated, viewing the employers' counterproposal as evidence of bad faith would put it in the forbidden position of sitting in judgment of the substantive terms of a party's contract proposals.

The Board also rejected the ALO's setting December 8, 1978, as the date on which the employers began to bargain in bad faith. It found the union's conduct early in the negotiations—such as its failure to request information far enough in advance, and its cancellation of meetings in December and January—prevented the emergence of a situation where the employers' good faith could be tested until the middle of February.

But the Board did uphold the ALO's finding the employers did not bargain in good faith. This holding is primarily based on the Board's analysis of the employers' declaration of a take-it-or-leave-it offer, the employers' announcement of the impasse and the public relations campaign. These areas will be discussed separately.

The Board set February 21, 1979, as the date on which the employers had clearly begun to evidence bad faith in negotiations. By this date, one week before impasse was asserted, both sides had the other's complete contract proposal and had expressed an unwillingness to make further signifi-

cant concessions. The employers' media campaign had come into full swing, but so too had the media campaign of the union.

The Board found the employers' last proposal was presented to the union in a "take-it-or-leave-it" fashion, although it contained major provisions which had never been discussed with the union. Rather than being presented as a bona fide offer, the Board found the February 21 proposal was designed as a tool for the employers' public relations campaign, and as a step toward the next week's declaration of impasse. While any statement made in negotiations may be deemed to be said in aid of the media campaign where one was being conducted, more is required to show bad faith negotiations.

■ The record does not support a finding the employers presented their February 21 offer in a "take-it-or-leave-it" manner; rather, when the offer was given, the union was told the employers were willing to negotiate further but only if there was a meaningful union response. The representatives of the employers never referred to the proposal as a "final offer," even though the union negotiator appeared to be trying to elicit just such an admission. The employers expressed a desire for a counterproposal from the union. The employer negotiators stressed their position the contract was a "serious" proposal and they took the significant step of signing the contract. From this step, the Board infers the contract was presented in a "take-it-or-leave-it" manner. Such an inference is without justification. Nothing was said to that effect at the time and, moreover, another bargaining session was scheduled.

At the next bargaining session, February 28, the union presented a counteroffer which only slightly reduced some of its economic demands. Even at oral argument on this review, union representatives admitted their reduction was not significant. The employer representatives called for a break and discussed the offer privately. When they returned, they rejected the union's proposal and there was no further discussion. It was then the employers stated they believed negotiations had reached an impasse. The union did not dispute that announcement. When the employers were holding fast to a limitation of 22 percent increase and the union was holding fast to its 123-190 percent increase, how can it be said from these facts either side was bargaining in bad faith? This was just hard bargaining on both sides which cannot be condemned.

It is important to note, too, the employers never refused to meet with the union on request and both sides did in fact meet later in Salinas as well as in Imperial Valley.

The evidence considered as a whole is not sufficient for the Board to reasonably conclude the February 21 offer was presented in a "take-it-or-leave-it" fashion.

■ Even if it can be assumed the employers delivered their offer in a "take-it-or-leave-it" manner, that fact alone does not establish a violation of the Act; the employers have the right to take a position and maintain it to stalemate if the position is held in good faith (*N. L. R. B.* v. *Herman Sausage Co.* (5th Cir. 1960) 275 F.2d 229, 231).

In *Continental Insurance Company* v. *N. L. R. B.* (2d Cir. 1974) 495 F.2d 44, 48, the court noted, "the determination of intent must be founded upon the party's overall conduct and on the totality of the circumstances, as distinguished from the individual pieces forming part of the mosaic. [Citations.]"

■ Next we address the question whether the employers' declaration of an impasse was justified under the circumstances or provides support of any inference showing bad faith.

The Board held the employers' declaration of impasse on February 28 was "premature and unjustified," and demonstrated their failure to bargain in good faith. The Board found not all of the mandatory subjects of bargaining had been discussed and the parties had substantial room for movement on several major items. It is interesting to note, however, the union did not deny they had reached an impasse in the negotiations. Although invited to do so, they demurred to further bargaining sessions and in August the union representative admitted the negotiations were at an impasse.

While it may be true there were issues which had not been discussed, those issues were not of major significance when compared to the economic issues. It was apparent, from discussions on health and safety issues, for example, progress could be made there. On the real issue—economics or wage schedules—the parties were far, far apart. Although the employers had moved up slightly with the "front end loading" of the increase to 22 percent and the union lowered its demands a very modest amount, something less than 5 percent, neither party showed any inclination to make real movement. This was very obviously the major hurdle in the negotiations. (7) "Those who bargain collectively are normally under an obligation to continue negotiating to impasse on all mandatory issues. [Citation.] The law relieves them of that duty, however, when a single issue looms so large that a stalemate as to it may fairly be said to cripple the prospects of any agree-

ment." (*N. L. R. B.* v. *Tomco Communications, Inc.* (9th Cir. 1978) 567 F.2d 871, 881.)

 We conclude the failure to negotiate the less important issues does not preclude a finding there was an impasse when this single issue of economics was the real cause of a stalemate.

 We next consider whether the employers evidenced a lack of sincerity, hence bad faith, in holding fast to the 7 percent annual increase. They contend these were the guidelines called for by the President to fight inflation and they wanted to adhere to them. The employers argue they never claimed to be legally bound by the guidelines, and never objected to the UFW's economic proposals as being above the maximum allowable under the guidelines. Instead, they only said the guidelines *might* be "applicable" to some of the parties and sanctions might be imposed. A thorough reading of the record supports that contention.

At the time of presenting the employers' proposal, Church said: "Well I can guarantee you that our proposal will be within the guidelines until we are told by the government that we are not subject to them." The employers' representative stated they had met with the federal agencies and were assured sanctions could be assessed. The employers' request to have the federal agents explain this to the negotiators were repeatedly rejected by the union. The employers' proposal included the following clause: "The companies have been informed by the United States government that the standards issued by the Council on Wage-Price Stability and printed in the Federal Register on December 28, 1978, are applicable to these negotiations, and believe that the above proposal is consistent with these standards and is fair to all parties."

At the January 23 negotiation session, employer representative Joe Herman twice said the employers had been told the guidelines were applicable to any wage increase they offered. On January 25, the employers presented a revised economic proposal to the union. Explaining it, Church said, "Our proposal is in accordance with the guidelines as we understand them." When offering the employers' last proposal on February 21, Church stated, "As we understand it, this proposal would be within the President of the United States' guidelines."

All three of the employers' economic proposals did conform to the guidelines, offering the maximum 7 percent increase in wages and benefits. The last proposal offered a higher increase in the first year of the contract, but

a lower one in the second and third years, so it could be said to average 7 percent over three years.

The employers' public relations campaign also stressed the applicability of the Presidential guidelines. Advertisements placed in newspapers on January 22, February 6, February 7, March 28, and April 8 all mention the guidelines. For example: "[W]e've already offered the maximum increase possible under President Carter's anti-inflation wage and price guidelines." (Salinas Californian (Feb. 6, 1979).)

"[W]e offered the highest possible raise, within the guidelines established by President Carter against inflationary salaries." (La Voz (Feb. 7, 1979).)

In light of all these statements, it is clear the employers took the position in negotiations the guidelines could be applied to agricultural employees and call for sanctions under proper conditions. (A farmer doing business with the federal government might be denied contracting privileges if he did not observe the guidelines.) It should be noted, however, even if the reason stated by the employers for adhering to the 7 percent annual increase was not justified as legally binding on the employees, that fact is not alone enough to evidence bad faith. ■ "[T]he employer may have either good or bad reasons, or no reason at all, for insistence on the inclusion or exclusion of a proposed contract term. If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate." (*N. L. R. B.* v. *Herman Sausage Co., supra,* 275 F.2d 229, 231.)

■ As the court in *Herman* notes, the employer's position must be "genuinely and sincerely held." The Board found the employers in this case, while adhering to the guidelines in negotiations, did not actually believe they were binding on them. In support of this finding, they point to the testimony of Ron Hull of Imperial Valley Vegetable Growers Association, who testified it was a voluntary guideline.

Everett Hillard, president of Harden Farms, one of the companies in the negotiations, testified:

"Q. Did you ever believe that you were bound by [the guidelines]?

"A. We felt that, under the circumstances, what we had received from the Union, this was the proper response to make for what movement the Union had made and because we had it—still an incomplete proposal from the Union.

"Q. So, it was just a bargaining position.

"A. That's right.

"Q. And it was never more than a bargaining position.

"A. Right."

There was, however, evidence one employer could suffer sanctions through its parent company, United Brands. Andrew Church testified he had been advised by a government official one of United Brand's other subsidiary's contracts with the government could be "put in jeopardy" if Sun Harvest entered into a collective bargaining agreement which violated the guidelines. ■ ■ ■ ■ However, this uncontradicted and unimpeached evidence was "viewed with distrust" by the ALO, especially as no one from Sun Harvest corroborated it (see *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721, 728).[4]

■ The ALO found the guidelines were voluntary, and they were, of course, but if they were not followed sanctions could be applied. The ALO also determined: "Apart from being voluntary, the guidelines are not applicable to employees earning $4.00 or less per hour . . . or nonresidents of the United States . . . . A large (but unspecified) proportion of the respondents' employees falls into one or both categories. . . ." Of course, with the wage increases sought by the union, a large (but unspecified) proportion of the employees would be excluded from the exempted categories. It cannot be said that the employers' concern was unjustified.

Given all this, there is a lack of substantial evidence in support of the Board's conclusion the employers did not believe they might be subjected to sanctions if the wage guidelines were not followed. Whether they were legally bound by guidelines is not the point the employers were making; they were concerned sanctions might be applied under proper conditions and that is a worthy reason even though the union may not like it.

---

[4]"An administrative board must accept as true the intended meaning of uncontradicted and unimpeached evidence. [Citations.] While the interest of a witness may be a factor warranting rejection of uncontradicted evidence in some circumstances [citation], there are other situations in which the interest of a party in obtaining relief will not render all of his testimony subject to disbelief. [Citation.] . . . .

"[W]hen a party testifies to favorable facts, and any contradictory evidence is within the ability of the opposing party to produce, a failure to bring forth such evidence will require acceptance of the uncontradicted testimony unless there is some rational basis for disbelieving it." (*Martori Brothers, supra,* 29 Cal.3d at p. 728.)

Abiding by guidelines to fight inflation, even if voluntary, is not inconsistent with the obligation to bargain in good faith. One need not wrap himself in the American flag, professing loyalty to the worthy objectives espoused by the President, to establish his sincerity.

To summarize, there is no substantial evidence to support the Board's finding of bad faith by the employers in that they claimed, without actually believing, they were bound by the presidential wage guidelines. The parties had reached an impasse and either of the parties was justified in declaring the fact.

### PUBLICITY

In late January of 1979, the Committee for Fair Negotiations Between Growers and Workers (CFN) was formed. With the assistance of two public relations firms the CFN prepared at least 19 advertisements, including duplicates appearing on different dates in different newspapers, from January 22 to April 24, 1979. Three ads in the English language were placed in major California and national newspapers and 16 ads in the Spanish language were published in newspapers with circulation around the California-Mexico border. Reprints of the Spanish language ads were distributed to people crossing into the United States early in the morning, mostly farmworkers employed by Imperial Valley growers. The advertisements criticized the union, its proposals, and Cesar Chavez, and stressed the fairness of the employers' offers.

The Board agreed with the ALO's analysis of the employers' public relations campaign, and held the advertisements, when considered with the employers' bargaining stance, constituted a per se violation of the Act. The petitioners attack this holding on a number of grounds.

First, they argue there is insufficient evidence in the record to support a finding the CFN had authority to speak for the employers. The Board's finding on this issue, however, is supported by substantial evidence and the employers' contention must be rejected.

During negotiations the employer representatives never disassociated themselves from the CFN, and never denied the CFN had the authority to speak for the employers. The employers' principal negotiator testified he had been consulted about some of the advertisements. There was testimony from Everett Hillard, president of Harden Farms, indicating the employers funded the CFN:

"Q. All right. Just so I understand, Harden sent money to the Free Marketing Council which retained the Dolphin Agency which placed ads in the name of the Committee for Fair Negotiations; is that correct?

"A. Correct."

A look at the composition of the CFN further serves to defeat the petitioners' argument. Involved in the CFN's formation were Jon Vessey (of petitioner Vessey & Company), Mario Saikhon (of petitioner Mario Saikhon, Inc.), Bill Daniels (of petitioner Lu-Ette Farms, Inc.), Mike Storm (of one of the original respondents before the Board, Veg-Pak), Dick Thorton (executive vice president of the Grower-Shipper Vegetable Association, and one of the employer negotiators), and Ron Hull (general manager of the Imperial Valley Vegetable Growers Association, and one of the employer negotiators).

Cochairpersons of the committee were originally Jon Vessey and Alice Colace (wife of one of petitioner Colace Brothers' partners). When the harvest moved north, they were replaced by Herb Fleming (of one of the respondents before the Board, Admiral Packing Co.), and Hal Moller (of respondent Growers Exchange, Inc.). Others who attended some of the CFN's meetings included Walter Byrgmann (of respondent California Coastal Farms), Joe Colace, Jr. (of petitioner Colace Brothers), Carl Maggio (of petitioner Carl Joseph Maggio, Inc.), and Lael Lee and Ed Stoll (both of respondent Growers Exchange, Inc.).

In light of this evidence, the Board's conclusion the CFN had the authority to speak for the employers is clearly supported by substantial evidence.

■■■■ Petitioners, however, contend their advertisements were protected by the Act's section 1155, which provides: "The expressing of any views, arguments, or opinions, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute evidence of any unfair labor practice under the provisions of this part, if such expression contains no threat of reprisal or force, or promise of benefit."

Petitioners argue none of their advertisements contain any "threat of reprisal or force, or promise of benefit," and so cannot be used by the Board as evidence of the employers' bad faith. In fact, the Board never did find the advertisements to contain any impermissible threats or promises.

But the Board did uphold the ALO's characterization of the employers' advertisements: "The ads addressed to the workers repeatedly exhort them

to pressure the union to accept the growers' offer, stress the companies' concern and the union's lack of concern with their welfare, and accuse the union and its officials of intimidation, terrorism, misrepresentation and outright lying, inadequate representation of its members, and misuse of funds.'' The Board then went on to hold: ''We concur with the ALO's conclusion that by their efforts to communicate directly to employees, bypassing the union, and in that communication to destroy employee support for the union, the Employers committed a per se violation of section 1153(e). *McFarland Rose Production Co.* (Apr. 8, 1980) 6 ALRB No. 18; *Medo Photo Supply Corp.* v. *N.L.R.B.* (1944) 321 U.S. 678 [88 L.Ed. 1007, 64 S.Ct. 830, 14 L.R.R.M. 581].''

Both of the cases cited by the Board involved employers who attempted to bargain directly with their employees rather than with the employees' collective bargaining agent, and both held such dealing to be a violation of the applicable labor relations act. The Board apparently found the employers' advertisements were a similar attempt to bargain directly with the employees, rather than the UFW, and so violated the Act.

The two cited cases, however, do not involve employer advertisements; both deal with employers who met directly with employees in an attempt to negotiate behind the union's back. In this case, to the contrary, the employers never attempted to meet with the employees, and only negotiated with the UFW. At most, it can be said the employers' advertisements criticized the union, proclaimed the fairness of their proposal, and urged the employees to tell the union representative to accept the contract. The advertisements did not ask the employees to abandon the union or to negotiate with the employers directly. The ads were only expressions of the employers' ''views, arguments, or opinions''; and neither of the cited cases explains why these expressions should not be protected by the Act's section 1155. We have reviewed the individual advertisements and consider them all protected by section 1155. Limiting either party's right to discuss the issues borders on a denial of First Amendment rights and should be approached very cautiously.

The Board then goes on to discuss a case in which advertisements were used as evidence of an employer's failure to negotiate in good faith, *N. L. R. B.* v. *General Electric Company* (2d Cir. 1969) 418 F.2d 736, cert. den. 397 U.S. 965 [25 L.Ed.2d 257, 90 S.Ct. 995], enforcing 150 N.L.R.B. 192. It is not made clear whether this case is discussed as further precedent for the above holding, or as precedent for the finding of a separate unfair labor practice, ''Boulwarism.''[5] Because of the importance of this case to the Board's holding, its facts must be discussed in some detail.

[5] Also spelled ''Boulwareism'' (see 418 F.2d at p. 740, fn. 1).

In 1946 the appellant employer, General Electric (GE), instituted a new approach to employee relations conceived of by one of its vice presidents, Lemuel R. Boulware. Pursuant to this plan GE first asked its management personnel for information as to the type and level of benefits desired by its employees. This information was then used to prepare specific proposals and their cost and effectiveness was researched. Last, GE took the proposals—its "product"—and "sold" them to its employees and the general public.

The last step, the most important part of "Boulwarism," was accomplished through a "veritable avalanche of publicity, reaching awesome proportions prior to and during negotiations." (*Id.,* at p. 740.) GE used a vast network of plant newspapers, bulletins, letters, television and radio announcements, and personal contacts, to sell its "product."

GE's communications described its product as a "fair, firm offer," in keeping with its desire to "do right voluntarily," without the need for any union pressure. GE said it would have nothing to do with what it characterized as the usual bargaining approach—where each side presents unreasonable demands initially, and eventually arrive at a middle ground both sides knew would be the probable outcome before bargaining began.

Instead, GE said it would hold nothing back in its first offer to the union. Though willing to look at union suggestions based on facts the company may have overlooked, GE said it would not deviate from its basic offer. GE stressed its unbending stance in its communications.

GE also used its media campaign to criticize the union and its leaders. The NLRB found this aspect of the campaign was designed for the purpose of: "disparaging and discrediting the statutory representative in the eyes of its employee constituents, to seek to persuade the employees to exert pressure on the representative to submit to the will of the employer, and to create the impression that the employer rather than the union is the true protector of the employees' interests." (*General Electric Co.* (1964) 150 N.L.R.B. 192, 195.)

Over the course of negotiations very few modifications were made in GE's original offer, and GE finally declared an impasse had been reached. After this the union's position weakened, and it eventually capitulated, agreeing to sign GE's proposed contract.

Unfair labor practice charges were filed by the union. The NLRB held GE had violated the NLRA by its conduct during the negotiations, and GE petitioned for review of this holding.

The court of appeals first upheld the Board's finding GE had violated the NLRA by unilaterally instituting an insurance proposal, by refusing to supply certain requested information, and by bargaining directly with individual local unions instead of the national negotiators. The court also upheld the Board's finding an overall failure to bargain in good faith on GE's part. This finding was based not only on the above mentioned unfair labor practices, but also on GE's media campaign.

Before it could consider GE's publicity campaign, however, the court had to deal with the NLRA's counterpart to section 1155 of the Agricultural Labor Relations Act, 29 United States Code section 158(c). GE argued the section (almost identical to the Act's § 1155) barred any use of its communications to show an unfair labor practice as none of those communications were found to contain any threats or promises of benefit. Looking at past decisions, and the purpose and legislative history of the NLRA, the court rejected this argument.

The court quoted Senator Taft, one of the authors of the NLRA's section 8(c): " 'It should be noted that this subsection is limited to "views, arguments, or opinions" and does not cover instructions, directions, or other statements that would ordinarily be deemed relevant and admissible in courts of law.' I Legislative History of the LMRA 1947, at 1541." (*N.L.R.B.* v. *General Electric Company, supra,* 418 F.2d 736, 760.) The court keys in on the word "relevant," finding section 8(c) was designed to prevent the Board from inferring the existence of an unfair labor practice from an unrelated speech or opinion of an employer. "Senator Taft later indicated, for example, in the context of a section 8(a)(3) discriminatory firing, that prior statements of the employer would have to be shown to 'tie in' with the specific unfair labor practice. I Legislative History of the LMRA 1947, at 1545. Later references to the section described the barred statements as those which were 'severable or unrelated,' and 'irrelevant or immaterial.' II Legislative History of the LMRA 1947, at 429 (Senate Report), 549 (House Conference Report). The objective of 8(c) then, was to impose a rule of relevancy on the Board in evaluating the legality of statements by parties to a labor dispute. Its purpose was hardly to eliminate all communications from the Board's purview, for to do so would be to emasculate a statute whose structure depends heavily on evaluation of motive and intent." (*Id.,* at pp. 760-761; fn. omitted.)

The court therefore held GE's communications could be used as evidence of an unfair labor practice, and further held GE's media campaign did evidence its failure to bargain in good faith. But this holding was a very narrow, carefully defined, one. "We hold that *an employer may not so combine*

*'take-it-or-leave-it' bargaining methods with a widely publicized stance of unbending firmness* that he is himself unable to alter a position once taken. It is this specific conduct which GE must avoid in order to comply with the Board's order, and not a carbon copy of every underlying event relied upon by the Board to support its findings. Such conduct we find, constitutes a refusal to bargain 'in fact.' *NLRB* v. *Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107 (1962). It also constitutes, as the facts of this action demonstrate, an absence of subjective good faith, *for it implies that the Company can deliberately bargain and communicate as though the Union did not exist,* in clear derogation of the Union's status as exclusive representative of its members under section 9(a). [Citation.]" (*Id.*, at pp. 762-763; italics added.)

This result was arrived at because the court felt such behavior unduly hindered good faith bargaining. By presenting its offer in a "take-it-or-leave-it" manner and publicizing its unwillingness to make any changes, GE had effectively painted itself into a corner. It could not make any later concessions to the union without losing face and damaging its reputation for truthfulness. GE had therefore effectively prevented any real negotiations from occurring with the union.

The NLRB in its decision also found another aspect of the media campaign—the discrediting of the union, the attempt to get the employees to exert pressure on the union to accept GE's offer, and the depiction of GE, rather than the union, as the protector of the employees' interests—evidenced GE's failure to negotiate in good faith. The court does not expressly approve or disapprove this finding. But the court clearly does not rely on it in its own holding, finding only a specific aspect of GE's media campaign to be violative of the Act—the combination of a "take-it-or-leave-it" bargaining position with a publicized stance of unbending firmness.

The ALRB has therefore incorrectly characterized both the court's and the NLRB's holding. Neither held, as the ALRB states they did, GE violated the Act because of its communications designed to disparage the union, influence the employees, and depict GE as the employees' protector. To the contrary, this single aspect of GE's communications was not the one relied on by the court, and the NLRB only held this aspect evidenced GE's bad faith—it did not hold it to be a per se violation of the Act (see *N. L. R. B.* v. *General Electric Company, supra,* 418 F.2d at p. 756; and *Chauffeurs, Teamsters and Helpers, Local 301* (1974) 210 N.L.R.B. 783, 786).

This incorrect characterization of the court's and the NLRB's holding in *General Electric* no doubt led to the previously mentioned holding of the ALRB in this case "by their efforts to communicate directly to employees,

bypassing the Union, and in that communication to destroy employee support for the Union, the Employers committed a per se violation of section 1153(e)." (7 A.L.R.B. No. 43, p. 19.)

Neither the NLRB's nor the court's holding in *General Electric* supports the ALRB's "per se" holding. And, as earlier discussed, the two other cases cited by the Board, *McFarland Rose Production Co.* (1980) 6 A.L.R.B. No. 18 and *Medo Corp.* v. *Labor Board* (1944) 321 U.S. 678 [88 L.Ed. 1007, 64 S.Ct. 830], also do not provide authority for the Board's use of the employers' communications to show a per se violation of the Act.

As there is no authority to support it, the Board's "per se" holding would in any case be error. ▆▆ Section 1155 of the Act demonstrates the intent of the designers of the ALRA to protect the communications of employers and unions. As Judge Friendly, discussing the purpose of the NLRA's section 8(c), noted in his dissent: "Congress had enough faith in the common-sense of the American working man to believe he did not need—or want—to be shielded by a government agency from hearing whatever arguments employers or unions desired to make to him. Freedom of choice by employees after hearing all relevant arguments is the cornerstone of the National Labor Relations Act." (*N. L. R. B.* v. *General Electric Company, supra,* 418 F.2d at p. 771.)

▆▆ The parts of the employers' media campaign pointed to by the Board—criticism of the union and its officials, urging the employees to pressure the union to accept the employers' offer, and stressing the companies' concern and the union's lack of concern with the employees' welfare—are by *themselves* just expressions of "views, arguments, or opinions," and so protected by section 1155 of the Act. These communications by the employers cannot be held a per se violation of the Act.

Although it is not made clear, it would appear *General Electric* was also discussed by the Board as support for the finding of another violation of the Act by the employers. At the end of its discussions, the Board quotes the court's specific holding in *General Electric*—the combination of "take-it-or-leave-it" bargaining methods with a publicized stance of unbending firmness violates the Act—and says it was in "terms remarkably suited to the facts before us . . . ." The Board concluded, "We hold that such practices are no more acceptable in California agriculture than in the industries subject to the NLRA."

Also, the Board began its discussion of the employers' media campaign by saying it agreed with the ALO's analysis.

The ALO found: "Through their public relations campaign the employers attempted to denigrate, undermine and bypass the union. They also combined 'take-it-or-leave-it' bargaining methods with a widely publicized stance of unwavering firmness. In addition to revealing an absence of subjective good faith, such conduct constitutes a per se refusal to bargain."

As the Board said it agreed with the ALO's analysis, and also said *General Electric*'s holding fit the facts of this case, it apparently (although not expressly) did find the employers combined "take-it-or-leave-it" bargaining methods with a publicized stance of unbending firmness. Following *General Electric,* this combined approach does constitute a per se violation of the Act because it constitutes a refusal to bargain "in fact." The question on review then becomes—is there substantial evidence to support the finding the employers did commit the prohibited combination of bargaining tactics.

As discussed earlier, there was a lack of substantial evidence to support the Board's finding the employers presented their February 21 contract proposal in a "take-it-or-leave-it" fashion. Even if it did, however, this does not rise to the level of "take-it-or-leave-it" bargaining shown in *General Electric.* From the beginning of negotiations GE said it would not move from its original offer, and took this position openly. Here, however, the Board itself would not characterize the employers as bargaining in a "take-it-or-leave-it" manner until February 21, one week before negotiations came to an end with the employers' declaration of impasse and well after most of the ads had already been run. Some of the ads which appeared after that date were merely reprints of the earlier copy.

The employers never openly stated or implied they would not move from their position and did in fact modify their offer slightly. Their signing of the contract to imply the sincerity of their offer cannot be construed to be a final, "take-it-or-leave-it" contract offer.

The employers' media campaign is pointed to as evidence of the employers' "widely publicized stance of unbending firmness." This campaign clearly did not reach the level of the one in *General Electric,* in either its extent or content. GE's communications throughout the negotiations stressed both the "fair, firm" nature of its offer and its uncompromising resolve not to change the offer. The employers here, however, especially in their early advertisements, stressed their desire to negotiate with the union.

After the employers' February 21 offer, the advertisements did urge the workers to tell the union to sign the "contract." Throughout the media

campaign, the employers stressed the fact their offer was within the Presidential wage control guidelines. For example: "That's why we've already offered the maximum increase possible under President Carter's anti-inflation wage and price guidelines." (Salinas Californian (Feb. 6, 1979).) "The farmers have offered the highest possible wage and benefits increases under President Carter's guidelines . . . ." (The Brawley News (Mar. 28, 1979).) "[W]e offered the highest possible raise, within the guidelines established by President Carter . . . ." (La Voz (Feb. 7, 1979).) "We the growers have offered the highest possible raise in salaries and benefits, under the guidelines of President Carter . . . ." (La Voz (Apr. 8, 1979).) The advertisements reflect the employers' position or, if you will, the employers' opinion (position) as to what was fair and what had been offered by them in the negotiations to that point. If they could not do that, section 1155 has no meaning. Publicly pronouncing they were offering the highest wages within the President's guidelines is far different from "mak[ing] the company seal itself into its original position in such a way that, even if it wished to change that position at a later date, its pride and reputation for truthfulness are so at stake that it cannot do so." (*N. L. R. B.* v. *General Electric Company, supra,* 418 F.2d 736, 764; conc. opn. of Waterman, J.)

Unlike GE, the employers here did not openly refuse to negotiate on all subjects. When the negotiations were effectively foreclosed in bargaining on the most important subject, wages and benefits, there was no use to bargain on the other items. This advertising, geared basically to the employees involved, was far different from GE's which was a gigantic, massive, full media blitz.

The basic elements of the conduct prohibited in *General Electric* are not found in this case—a "take-it-or-leave-it" bargaining method and a widely publicized stance of unbending firmness. More importantly, this media appeal was not the cause of the impasse which GE suggests must appear. As we have noted above, that was a result of hard bargaining and was reached very shortly after the ads appeared.

To conclude, the Board's holding the employers' communications disparaging the UFW, urging the employees to pressure the union, and depicting the employers as the protector of the employees' interests, were a per se violation of the Act cannot be upheld.

### "TOTALITY OF CONDUCT"

Finally, we submit the Board, in finding the employers guilty of bad faith bargaining, has failed to give adequate consideration to the overall

conduct of the parties during negotiations. ▇ Before finding a failure to bargain in good faith, the "totality of the employers' conduct" must be examined; this includes a consideration of the union's conduct. (*National Labor Relations Bd.* v. *Reed & Prince Mfg. Co.* (1st Cir. 1953) 205 F.2d 131, 134; *Wald Manufacturing Company* v. *N. L. R. B.* (6th Cir. 1970) 426 F.2d 1328, 1331-1332.) ▇ We point to three general areas of alleged union bad faith and employer good faith which must be accorded weight in the totality of the circumstances.

First, the union's extreme demands at the outset and its unwillingness to compromise or negotiate in good faith. The union cancelled meetings; it refused to join the employers in a request for a federal mediator and a representative from the Council on Wage and Price Stability which might have provided the catalyst for resolution of differences; it called for strikes before it had even presented a complete proposal to the employers; and it failed to make more than small concessions in its proposals. The impasse was as much the result of the union's conduct as of any of the employers' actions.

Second, the employers' publicity campaign cannot be seen as evidence of bad faith when it is considered in connection with the union's own publicity campaign. It was the union which began the media battle when it violated an apparent early agreement[6] between the parties to avoid publicity in the media concerning negotiations. The union's communications were every bit as critical of the employers as the employers' communications were of the union. The employers' advertisements were, in our opinion, no more than just responses to the union's charges.

While the UFW's leaflets do not approach the employers' advertisements in either number or detail, some of them do portray the employers and their proposals in a very unfavorable light. The advertising of each party could be held to be a counterbalancing factor for the other's advertisements and no more offensive than those issued by the adversary. They deserve each other.

Lastly, it should be noted the employers did not cancel or miss any meetings, never refused to discuss any issues with the union and never refused to bargain again when desired by the union. This of course does not of itself prove an intent to bargain in good faith, but in the total picture certainly provides substantial evidence of that fact.

---

[6]As the ALO suggests, the testimony concerning this oral agreement not to go public was very vague. There would appear to have been a consensus not to negotiate through the press, or to comment on the progress of negotiations to the press.

Serious strike misconduct has been held to be adequate justification for an employers' refusal to bargain (*Kohler Co.* (1960) 128 N.L.R.B. 1062, mod. on other grounds, (D.C. Cir. 1962) 300 F.2d 699, cert. den. (1965) 382 U.S. 836 [15 L.Ed.2d 79, 86 S.Ct. 82] and *Union Nacional de Trabajadores* (1975) 219 N.L.R.B. 862, mod. on other grounds, (1st Cir. 1976) 540 F.2d 1). The violence which took place in the strikes against the employers here was "serious misconduct," and so would have justified their refusing to bargain with the UFW. The employers' continuing to meet with the union under the strain of this violence further demonstrates their desire to reach an agreement and is consistent with a desire to pursue good faith bargaining and an actual desire to reach agreement.

It is apparent from the totality of the circumstances here, neither party can be said to be solely responsible for the impasse or the alleged unfair labor practices.

### DISPOSITION

There being a lack of substantial evidence to show either a failure to negotiate in good faith or an unfair labor practice, the order of the Board is annulled. The consolidated case, *Vessey & Company, Inc.* v. *A.L.R.B.*, is remanded to the Board for consideration of the striking employees' reinstatement rights as economic strikers.

Brown (Gerald), P. J., concurred.

**WIENER, J.**—I respectfully dissent.

In light of the disposition of this case, I will restrict my comments to only those issues discussed by the majority. My silence on the remedy issue, however, should not be construed as indicating my agreement with petitioners' contentions.

In my view there is ample evidence to support the board's conclusion the employers did not bargain in good faith. Like the majority, I will discuss separately the "take-it-or-leave-it" offer, the employers' announcement of the impasse and the public relations campaign.

*The "Take-It-or-Leave-It" Offer*

The majority state "The record does not support a finding the employers presented their February 21 offer in a 'take-it-or-leave-it' manner." (Majority opn., *ante,* p. 57.) I disagree. Among the facts relied on by the ma-

jority is the fact that "representatives of the employers never referred to the proposal as a 'final offer.'" (See majority opn., *ante,* p. 57.) I am unimpressed. The board was properly concerned with the substance, not the form, of the contract's presentation. Our function in reviewing the evidence is not to decide between conflicting views on a de novo basis, but rather on the whole record whether substantial evidence justifiably supports the board's decision. (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467, 71 S.Ct. 456].) Here, in addition to the statements by Andrew Church (see majority opn., *ante,* p. 59) and the further statements by employer representatives that the contract was a "serious proposal" (see majority opn., *ante,* p. 57), the employer representatives took the unprecedented step of signing the contract. This could all be reasonably seen by the board as evidence the contract was presented in a "take-it-or-leave-it" manner.

Lending more credence to this view is the employers' conduct at the next bargaining session, February 28. The union presented a counteroffer which slightly reduced some of its economic demands. The employer representatives called for a break, after which they rejected the union's proposal without any discussion of it, and declared impasse. This timing—declaring impasse at the next meeting after the contract's presentation, without any discussion of the union's counterproposal—also can be seen as evidence the contract was presented as a "final offer."

Lastly, the employers' use of the February 21 contract in their public relations campaign evidenced its "take-it-or-leave-it" nature. A full page ad of February 24 in La Voz, a Mexicali newspaper read by many of the agricultural employees in Imperial Valley, was headlined, "We have already signed the contract, why doesn't the Union sign it?" The ad goes on to state "The contract is complete in each of its clauses and it is already accepted and signed by the 27 affected companies. Now, the Union must also sign it so that you can return to work."

All of this evidence considered together is sufficient for the board to have reasonably found the February 21 offer was presented in a "take-it-or-leave-it" fashion. Because there is sufficient evidence on this issue I would affirm the board's finding.

I understand this fact alone does not establish a violation of the act. Employers have the right to take a position and maintain it to stalemate if the position is held in good faith. (*N. L. R. B.* v. *Herman Sausage Co.* (5th Cir. 1960) 275 F.2d 229, 231.) But I believe the board's conclusion of the lack of good faith is amply supported. The employers' presentation of the

February 21 contract in a "take-it-or-leave-it" fashion was properly found by the board on substantial evidence to have been designed solely to reap public relations benefits and to set up a bargaining impasse. I agree with the board's conclusion setting February 21 as the date on which the employers began to bargain in bad faith.

*Impasse*

My principal difference with the majority on the question of impasse is how we view the effect of the Federal Wage Control Guidelines. The majority say "there is a lack of substantial evidence in support of the Board's conclusion the employers did not believe they might be subjected to sanctions if the wage guidelines were not followed. . . . [T]hey were concerned sanctions might be applied under proper conditions and that is a worthy reason even though the union may not like it." (Majority opn., *ante,* p. 61.)

To reach this conclusion the majority ignore the plain reading of the guidelines, the testimony of Everett Hillard (majority opn., *ante,* pp. 60-61) and the testimony of Ron Hull of the Imperial Valley Vegetable Growers' Association who assisted the employers during the negotiations. Hull testified:

"Q. Was it your position that the seven percent was required by law?

"A. It was a voluntary guidelines, and it was certainly a substantial offer in relation to other contracts that had been negotiated.

"Q. Was it your position that the seven percent was required by law?

". . . . . . . . . . . . . . . . . . . . . . . . .

"Witness: It was a voluntary guidelines, so it wasn't necessarily it was 'required by law.' It is obvious that it wasn't required by law." Given these facts, there is ample support for the board's conclusion the employers did not believe they were bound by the wage guidelines. In effect, the employers had a convenient and patriotic red herring to use as an obstacle to good faith bargaining. "[A]dhering to an untenable legal position during the course of negotiations is inconsistent with the obligation to bargain in good faith." (*Fraser & Johnson Company* v. *N.L.R.B.* (9th Cir. 1972) 469 F.2d 1259, 1263; *Queen Mary Restaurants Corp.* v. *N. L. R. B.* (9th Cir. 1977) 560 F.2d 403, 409.) The possibility of resolving the parties' respective differences over economics was prevented by the employers' adherence to the guidelines, an adherence not maintained in good faith. The effect of this

amounted to a refusal to bargain as to economics and evidenced the employers' failure to negotiate in good faith.

*Public Relations Campaign*

For brevity I will confine my remarks to the majority's rejection of the board's conclusion that the employers' combined "take-it-or-leave-it" bargaining methods with a publicized stance of unbending firmness constituted a per se violation of the act representing a refusal to bargain "in fact." In my view there is substantial evidence to support the finding the employers committed the prohibited combination of bargaining tactics.

As I stated earlier, there is substantial evidence to support the board's finding the employers presented their February 21 contract proposal in a "take-it-or-leave-it" fashion. The employers here were found to be bargaining in a "take-it-or-leave-it" manner on February 21, one week before negotiations came to end with the employers' declaration of impasse. Although the employers may never have openly admitted they would not move from their position, there was substantial evidence of a "take-it-or-leave-it" attitude on their part.

Initially the employers' media campaign may have indicated a desire to negotiate with the union. After the employers' February 21 offer the advertisements demonstrated a subtly changed tone. They asked why the union had not signed the "contract," stressed the fact the employers had signed it and urged the workers to pressure the union to sign the "contract." These advertisements only refer to the "contract"; no mention is made of negotiating with the union.

More importantly, throughout the media campaign, the employers stress the applicability of the presidential wage control guidelines. For example: "That's why we've already offered the maximum increase possible under President Carter's anti-inflation wage and price guidelines." (Salinas Californian (Feb. 6, 1979).) "The farmers have offered the highest possible wage and benefits increases under President Carter's guidelines . . . ." (The Brawley News (Mar. 28, 1979).) "[W]e offered the highest possible raise, within the guidelines established by President Carter . . . ." (La Voz (Feb. 7, 1979).) "We the growers have offered the highest possible raise in salaries and benefits, under the guidelines of President Carter . . . ." (La Voz (Apr. 8, 1979).) The advertisements reflect the employers' position during negotiations. Their representatives repeatedly told the union the guidelines were applicable, and would be followed.

It is in these advertisements, and in others mentioning the guidelines and the employers' 7 percent offer, where the employers' publicity campaign most closely paralleled the aspects of the campaign prohibited by *N. L. R. B.* v. *General Electric Company* (see majority opn., *ante,* pp. 64-67) by publicly pronouncing they could not offer more than the 7 percent allowed by the guidelines, the employers did what the court found General Electric (GE) did: "[sealed] itself into its original position in such a way that, even if it wished to change that position at a later date, its pride and reputation for truthfulness are so at stake that it cannot do so." (*N. L. R. B.* v. *General Electric Company* (2d Cir. 1969) 418 F.2d 736, 764 (conc. opn. of Waterman, J.).)

Unlike GE, the employers here did not openly refuse to negotiate on all subjects. But because of their bad faith adherence to the position the guidelines were applicable, the employers effectively foreclosed any bargaining on the most important subject, wages and benefits. Without the ability to move in this area the negotiations could only end with either union capitulation or impasse. This is not consistent with the act's requirement to bargain in good faith, and is the result the court in *General Electric* was trying to prevent.

The basic elements of the conduct prohibited in *General Electric* are found in this case—a "take-it-or-leave-it" bargaining method and a widely publicized stance of unbending firmness. While the violative conduct here was not as extensive or as conspicuous as GE's conduct, it led to the same result—impasse.

Again, I believe substantial evidence supports the board's conclusion the employers' media campaign combined with their bargaining tactics violated the act.

*Totality of Conduct*

I also respectfully disagree with the majority's conclusion that "in finding the employer guilty of bad faith bargaining, the Board failed to give adequate consideration to the overall conduct of the parties during negotiations."

First, as to the union's conduct (majority opn., *ante,* pp. 70-71) it can be reasonably assumed the board considered all of these union actions in arriving at its holding, as all are mentioned in the board's recitation of facts. Evidencing this consideration is the board's reversal of the ALO's setting of December 8, 1978, as the date at which the employers began to bargain

in bad faith. The board held the union's lack of preparation and cancellation of meetings made it impossible to judge the employers' good faith until mid-February, and adjusted the date on which its make-whole order was to be calculated from accordingly.

But more importantly, this argument must fail in light of the employers' bad faith insistence on the applicability of the wage control guidelines. As the employers' adherence to the guidelines prevented any movement on the key issue in negotiations, wages and benefits, they prevented the emergence of a situation where the union's willingness to compromise and bargain in good faith could be tested. Perhaps the negotiations would have ended at an impasse even if the employers had not insisted on the applicability of the guidelines; perhaps not. It was the employers' conduct which made this impossible to determine. They can fairly be held responsible for this result.

Second, as to the employers' publicity campaign, the union's alleged violation of the agreement to avoid publicity proves little. As the ALO notes, the testimony concerning this oral agreement was very vague. There appears only to have been a consensus not to negotiate through the press, or to comment on the progress of negotiations to the press. Leaflets distributed by the union neither violated this agreement nor were they targeted at union members, and were not distributed to the press or the public at large. The single advertisement placed by the union, run in La Voz on January 12, was found by the ALO not to have reported the contents of negotiations.

In my view, it is the "Boulwarism" aspects of the employers' communications which violated the act. In that sense the employers' communications stood alone. The union did not take a "widely publicized stance of unbending firmness." It is this aspect of the employers' communications, considered with their "take-it-or-leave-it" bargaining methods, which are critical. The union's advertisement and leaflets criticizing the employers do not excuse this interference with the bargaining process.

Finally, the majority noted the employers' good faith in not canceling any meetings and never refusing to discuss any issues with the union. This conduct, however, is not decisive. It clearly does not prove an intent to bargain in good faith. Depending on the surrounding circumstances, it may show no more than a desire to go through the motions—surface bargaining.

Whether the majority is correct in stating strike misconduct excuses a refusal to negotiate (majority opn., *ante,* p. 72) is academic. There is no case holding such misconduct may serve as an excuse for surface bargaining. And, this is exactly what the board found the employers did here. By

refusing to meet with the union an employer can force the cessation of strike misconduct, which would then allow the resumption of negotiations. By continuing surface negotiations, the employer does not end strike misconduct and does not comply with the act's mandate—good faith bargaining.

While continuing negotiations when arguably possessed of the right to discontinue them is perhaps some evidence of a desire to reach agreement, it is certainly not overwhelming evidence. Continuing negotiations in the face of the strike is as consistent with a desire to give an *appearance* of good faith bargaining as it is with an actual desire to reach agreement. As there is substantial evidence to support the board's conclusion the employers were engaging in surface bargaining, its determination should be upheld.

The foregoing reasons convince me the order of the board should not be annulled. There is substantial evidence in the record supporting the board's conclusion of bad faith bargaining on and after February 21, 1979. Accordingly, I would affirm the orders.

The petitions of respondent and real party in interest for a hearing by the Supreme Court were denied June 14, 1984. Bird, C. J., did not participate therein. Reynoso, J., was of the opinion that the petitions should be granted.